On Application for Rehearing
This is a custody-modification case. Sandra Ray Morgan Davis, the mother, and Jason Duane Davis, the father, divorced in October 1995. The court awarded the parties joint custody of their two minor children, with primary custody being vested in the mother.
On January 2, 2001, the father petitioned for a modification of the divorce judgment and for temporary custody, alleging that a material change in circumstances had occurred in that the mother had moved from Alabama to Tennessee and that she and the children were living there with her boyfriend. The mother answered and counterclaimed, seeking a modification of the final judgment, alleging that a material change in circumstances had occurred, and seeking a recalculation of child support.
Following an ore tenus hearing, the court, on April 28, 2001, entered a three-sentence order on the case action summary; that order stated:
 "Petition for Modification is granted. Joint custody with the parties with physical custody to be awarded to [the father]. Liberal visitation to be given to [the mother]."
The mother moved for a stay of execution of the final order, and the court granted the motion and stayed the execution of its order, pending disposition of "any and all postjudgment motions." The mother moved the court to set aside its final judgment, or, in the alternative, to alter or amend the judgment, or for a new trial; *Page 1254 
the court denied the motion. The mother then moved the court to extend the stay pending an appeal; the court denied the mother's motion. The mother appealed.
The mother argues that the trial court abused its discretion in changing custody from her to the father, claiming that the father did not meet the requirements of Ex parte McLendon,455 So.2d 863 (Ala. 1984). She further argued that the trial court misapplied the standard of Hodges v. Nelson, 370 So.2d 1020
(Ala.Civ.App. 1979). In Hodges, this court held that "[t]he primary consideration in this case, as in every custody case, is the welfare of the children." This court further held that in considering a parent's conduct, the court must determine whether the welfare of the children is adversely affected, and held that "[t]his determination, as with other factual matters, is within the broad discretionary powers of the trial court." Id. at 1021-1022.
"The ore tenus rule is applicable to child-custody-modification proceedings, and the court's judgment based on its findings of fact will not be reversed absent a showing that the findings are plainly and palpably wrong." E.M.C. v. K.C.Y., 735 So.2d 1225,1228 (Ala.Civ.App. 1999). This court has stated:
 "When a noncustodial parent seeks to modify the custody provision of a prior judgment, the evidentiary standards set forth in Ex parte McLendon, 455 So.2d 863 (Ala. 1984), must be applied. The petitioning parent must show that a change in custody will materially promote the child's best interests and welfare. Id. That parent must also show that the good brought about by the change in custody would more than offset the inherently disruptive effect caused by uprooting the child. Butts v. Startley, 600 So.2d 310 (Ala.Civ.App. 1992)."
Etheridge v. Etheridge, 712 So.2d 1089, 1091 (Ala.Civ.App. 1997). We have further held:
 "The question is not the presence or absence of sexual activity in [the mother's] social life; rather, the trial court must determine whether the emphasis on social life, promiscuous or chaste, detracts from a stable, worthwhile home environment for the child."
Junkin v. Junkin, 332 So.2d 392, 395 (Ala.Civ.App. 1976).
The father testified that he has worked as a firefighter for the City of Dothan since 1990. He further testified that he lived in a three-bedroom house and that he had a male friend that "stays at the house sometimes." He went on to state that if he was awarded custody, his friend would "leave."
The father testified that he and the mother had been married for almost six years when they divorced in 1995. He stated that they had two children, a girl and a boy, age 10 and 8, respectively, at the time of the hearing. He testified that at the time of the divorce he exercised visitation with the children one day each week and every other weekend, with standard holiday visitation. He went on to state that the parties had increased his weekly visitation to two days per week.
The father testified that the mother had informed him approximately one month before she moved that she and the children would be moving to Clarksville, Tennessee.[2] He further testified that they had discussed his visitation with the children, and that she had offered to meet him in Birmingham on the weekends to cut his travel time in half. He stated that he had *Page 1255 
not been able to exercise his midweek visitation since the mother had moved.[3]
He acknowledged that the children had made friends in Tennessee, and that they were involved in the same type of extracurricular activities there as they had been involved in in Dothan. He stated:
 "I would love to have my children, but I want them to be happy. I mean, I want whatever they want . . . [i]f . . . [the children] want to live with [the mother], they can go now. I have no problem with that, none."
The father testified that he was aware that the mother had recently remarried and he presented no evidence that would indicate a problem with the mother's new husband. He further stated that he had no concerns regarding the morals of the mother.
At the close of the father's case at trial, the mother moved to dismiss the father's petition, arguing that the evidence did not warrant a change of custody. The court responded as follows:
 "THE COURT: I understand, except for one little fact . . . that she was living with somebody as the kids said. Apparently, she keeps repeating her pattern of conduct, even after the Court instructed her last time . . . she's going to have to get up here and explain to me some things. Apparently, she has not learned her lesson. I don't understand why we had a hearing before, and she was warned and told, and she still engages in that conduct. I'm not going to have it around the kids that age. And I don't understand, ma'am, what you were thinking at the time. Do you think you can keep on and keep on?
 "THE MOTHER: Your Honor, he has his own house. He has two houses.
 "THE COURT: That is not the problem, ma'am. The problem is that you lived with a man you were not married to in front of a kid that is 8 and 10 years old after you had come to . . . this very court. And because of that fact, before you almost lost the kids, and then you just keep doing it. I don't understand . . . maybe I'm thick-headed or something . . . I don't understand. Go ahead. You know . . . I'm just not going to have it. And you knew it too, ma'am. You knew what the consequences were, because I told you —
"THE MOTHER: Your Honor, we were not living together.
 "THE COURT: Oh, well, that is not what your kids said.
 "THE MOTHER: I'm not saying that he was not there . . . he has a house a mile and a half from me." (R33)
The mother testified that she met the man who is now her husband in June 2000 and that they had married the weekend before the modification hearing. She further testified that after she and the children moved to Tennessee, she and her then fiancé maintained separate residences, although he would occasionally spend the night with her on the weekends.[4] She went on to state that the children got along "great" with her new husband, and that he treats them "very well."
After the mother testified, the court questioned the mother:
 "THE COURT: . . . Ma'am, let me ask you this, you stated that you didn't live with him, except on . . . a couple of *Page 1256 
weekends . . . Did he sleep there overnight?
"THE MOTHER: Yes, sometimes he did.
 "THE COURT: Okay. And where would he stay when he slept overnight?
"THE MOTHER: Where would he sleep?
"THE COURT: Yes, ma'am.
"THE MOTHER: With me.
 "THE COURT: Okay . . . [t]hat is all I need to hear. . . .
". . . .
 "THE COURT: You know, it's no doubt that she is a pretty good mom and all that, but I just can't tolerate this kind of stuff, especially when the Court has instructed her not to do this. . . . That shows to me just a total disregard of wanting those kids, because she knew how I felt about it. Didn't you ma'am? Did you not know how I felt about that type of thing?
"THE MOTHER: Yes, sir.
 "THE COURT: . . . You know, other than that, I haven't got any problem with you. But I just can't let that go on."
It appears that the trial court based its decision to change custody on the mother's allowing her fiancé to occasionally spend the night with her before the marriage. We note that the father conceded that he had allowed a female to spend the night in his home while the children were present on at least one occasion. After thoroughly reviewing the record, we conclude that although the mother's out-of-state move will result in a change in the father's visitation schedule, the father failed tmeet the stringent burden imposed by Ex parte McLendon, 455 So.2d 863
(Ala. 1984).
APPLICATION GRANTED; MEMORANDUM OF NOVEMBER 1, 2002, WITHDRAWN; OPINION SUBSTITUTED; REVERSED AND REMANDED.
CRAWLEY, J., concurs.
THOMPSON, J., concurs in the result.
PITTMAN and MURDOCK, JJ., dissent.
[2] According to the father, Clarksville is a seven-hour drive from Dothan.
[3] The record indicates that the mother had been living in Tennessee for approximately four months at the time of the hearing.
[4] She denied that the children ever witnessed any sexual contact between her and her new husband either while they were dating or after they were married.